Filed 5/17/23  In re W.R. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re W.R. et al., Persons Coming Under the Juvenile Court Law. | B318381, B322631 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. W.R., Defendant and Appellant. | Los Angeles County Super. Ct. No. 18LJJP00452B-C |
| In re P.R., A Person Coming Under the Juvenile Court Law. | B318385 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. W.R., Defendant and Appellant. | Los Angeles County Super. Ct. No. 18LJJP00395B |

APPEALS from orders of the Superior Court of Los Angeles County.  Michael C. Kelley and Donald A. Buddle, Jr., Judges.

Affirmed as to case No. B318381. Affirmed in part, reversed in part and remanded with instructions as to case Nos. B318385 and B322631.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louis, Principal Deputy County Counsel, for Plaintiff and Respondent.

* * * * * * * * * *

These consolidated appeals are the latest we resolve concerning father and his dependent children. (See *In re W.R.* (Aug. 20, 2021, B308881) [nonpub. opn.]; *In re W.R.* (Aug. 20, 2020, B304013, B304856) [nonpub. opn.]; *In re W.R.* (Aug. 6, 2019, B292121, B294990) [nonpub. opn.]; *In re P.R.* (Sept. 16, 2019, B295642) [nonpub. opn.]; *In re P.R.* (Aug. 2, 2019, B293713) [nonpub. opn.].)[1] Father here challenges (i) the orders denying, without an evidentiary hearing, a trio of petitions under Welfare and Institutions Code[2] section 388—one each concerning his now 11- and 13-year-old sons and the other his 5-year-old son, P.R.; and (ii) the visitation provisions of the orders appointing legal guardians for the same three boys. We affirm denial of the

---

[1]    We grant father's unopposed requests for judicial notice of our opinions in *In re W.R., supra,* B308881 and *In re P.R., supra,* B295642. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) We take judicial notice of the other opinions on our own motion. (See, e.g., *Estate of Dito* (2011) 198 Cal.App.4th 791, 795, fn. 3 [taking judicial notice, on court's own motion, of unpublished opinion in prior appeal in same matter].)

[2]    Undesignated statutory references are to the Welfare and Institutions Code.

section 388 petitions and remand to the juvenile court for entry of revised guardianship orders specifying the duration and frequency of visits to which father is entitled.

## BACKGROUND

We summarize background facts from our earlier opinions.

Father has an extensive history with the Los Angeles County Department of Children and Family Services (Department), with numerous referrals in 2010, 2013, 2016, 2018, and 2020. All referrals related to drugs and domestic violence.

Father also has an extensive history with law enforcement, with numerous arrests and convictions (some resulting in prison time) spanning from 1992 to 2020.

Father also has a history of mental health issues. He has been diagnosed with bipolar disorder and schizophrenia. Doctors have struggled to treat these conditions, owing at least in part to father's failure to comply with doctors' orders regarding treatment. Father has a history of refusing to take some medications and abusing others.

These proceedings began following referrals in 2018. The initial referral was in May of that year based on an incident of domestic violence between father and P.R.'s mother, O.E. P.R. and O.E.'s daughter from another relationship were present. O.E. was father's girlfriend at the time. O.E. is not a party to this appeal, and the disposition as to her daughter is not at issue, so we omit details about her except where relevant.

The second referral came about a month later, in June 2018, based on another incident of domestic violence between father and O.E. P.R. and father's three other children, including the 11- and 13-year-old sons involved here, were in the home for this incident. Because they share common initials with other

3

parties involved, we refer to P.R.'s half siblings by their current age, or, collectively, as P.R.'s half brothers. The mother of these three children has not been in their lives for years and is not a party to this appeal. The disposition as to the eldest of these children, who is now 18, is not at issue in this appeal so we omit details about him except where relevant.

In June 2018, just days after the second referral, the Department filed a petition concerning P.R. and his half sister against father and O.E. P.R. was released to father and O.E., subject to family maintenance services and a no-contact order between the parents. At the time, O.E. was also subject to a criminal protective order prohibiting contact with father stemming from the June 2018 domestic violence incident.

In July 2018, the juvenile court sustained the petition as to P.R. based on the May and June 2018 domestic violence incidents that led to the referrals. P.R. remained released to father at that time.

Around the same time, the Department filed a petition regarding P.R.'s half brothers. The juvenile court sustained that petition about a month later, in August 2018, based on the history of domestic violence as well as father's mental health and prescription drug abuse. Like P.R., his half brothers remained released to father at that time. The juvenile court ordered further services for father.

The Department learned in September 2018 that father and O.E. had been violating the juvenile and criminal court orders restricting their contact. The Department filed a subsequent petition against father and O.E. in P.R.'s case based on the parents' violations of the criminal court's protective order, which the juvenile court sustained. In October 2018, P.R. and his

4

half brothers were placed in foster care. P.R. was placed with maternal great-grandmother. His half brothers were placed with nonrelative foster parents.

Around the same time the children were placed in foster care, father underwent an Evidence Code section 730 evaluation, performed by Dr. Sheila Morris. Dr. Morris diagnosed father with schizoaffective disorder, bipolar type. She expressed concern about his ability to care for his children as he was not taking his medications. She recommended counseling, medication, parenting and anger management classes, and a follow-up examination in six months.

The Department relied on Dr. Morris's report in defeating father's December 2018 section 388 petition to regain custody of P.R.

Father took the classes and underwent counseling Dr. Morris recommended but did not take any psychotropic medications. When she reevaluated him in April 2019, father's diagnosis remained the same but he showed signs of improvement, alleviating Dr. Morris's concerns about his ability to parent. In May 2019, P.R.'s half brothers were returned to father's care, under the Department's supervision and subject to certain conditions imposed by the juvenile court. Among those conditions were that father was to submit to random and on-demand drug testing, participate in family preservation services, and cooperate in getting individualized education plans for the children.

After regaining custody of P.R.'s half brothers, father's cooperation with the Department dropped off significantly. He stopped returning phone calls, failed to submit to drug testing,

moved without notifying the Department, and refused to disclose where he was staying.

The 11- and 13-year-old boys also began having more trouble at school. They were performing so poorly, both academically and behaviorally, that the school's principal asked the Department for help. The principal reported that father refused to cooperate with the school in getting them services. The Department met with the children at school, which angered father. Father took the children from school and thereafter frustrated the Department's efforts to arrange a home visit. Concerned for the children's safety, the Department sought and obtained an order detaining them in October 2019. The 11- and 13-year-old boys were again placed in foster care; the 18-year-old was allowed to remain in father's care.

The Department filed a supplemental petition alleging father had failed to make the children available for Department visits and failed to participate in drug testing and family preservation services. It also filed a subsequent petition alleging father refused to cooperate with the school to obtain mental health services for the 11- and 13-year-old boys. In December 2019, the juvenile court dismissed the supplemental petition without prejudice, sustained the subsequent petition, and ordered the 11- and 13-year-old boys removed from father. It further ordered father to participate in a new Evidence Code section 730 evaluation, on-demand drug testing, parenting classes, and individual counseling. Two months later, upon request of counsel for the boys based on father's refusal to allow the boys to get needed help at school, the juvenile court entered an order limiting father's educational rights.

Around the same time, the Department was noting issues with father regarding P.R. Father's visits had been liberalized to unmonitored, but the Department requested that they revert to monitored based on concerns that father was generally uncooperative, refused to provide information about his mental health counseling and medications, and was skipping drug tests. Despite father's lack of compliance with his obligations, P.R. was noted to be "happy in [father's] presence." The juvenile court ordered four monitored visits to revert to unmonitored public visits if the monitored visits went well.

Father underwent the next court-ordered Evidence Code section 730 evaluation in May 2020, again with Dr. Morris. She opined that father had "several noticeable regressions" since his last evaluation, including "increased grandiosity, circumstantiality and tangentiality, with delusion." Although father reported he was seeing a psychiatrist twice per month, and she had prescribed him medication, he was not taking the medication. Father's diagnosis for schizoaffective disorder remained the same, which is a lifelong condition requiring treatment. Dr. Morris believed father to be "less psychologically stable" than he had been at his last evaluation. She was concerned that father's "unmet psychiatric needs, lack of treatment, denial" are "concerning risk factors that . . . father may encounter future episodes and decompensation." She felt father had "minimal to poor parenting capacity." Dr. Morris recommended father receive therapy at least once per week, and monthly medication monitoring. She believed father should continue to engage in reunification services.

That same month, the 11- and 13-year-old boys ran away from their placement. When asked why they ran away, they

reported father had told them to leave if they "don't like something." It later came to light that, on more than one occasion, father told them to run away from their placement. The caregiver reported that contact with father seemed to cause the boys anxiety. The boys reported that father also told them to misbehave in their placement. Both boys wanted to stay with their current foster mother.

At the same time, P.R. was "thriving and doing well" in the home of maternal great-grandmother. Father was speaking to P.R. by phone on a weekly basis. A May 2020 report in P.R.'s case noted that father was participating in counseling but still refusing to confirm whether he was taking prescribed psychotropic medications.

A few months later, however, father's telephone visitation had become more sporadic, dropping to once a week or once every other week. When the Department questioned father about this in October 2020, he expressed a lack of interest in visiting with P.R. He told the Department to "do whatever you want and whatever you think is best for him. . . . I'm not gonna fight over him."

Also in October 2020, father sought return of the 11- and 13-year-old boys at their section 366.21, subdivision (e) six-month review hearing. The Department opposed this effort. A social worker testified that father had completed his drug program, parenting classes, and domestic violence classes but was not yet participating in weekly counseling, instead going just once or twice per month. Father testified he was then taking two prescribed psychotropic medications but had not seen a therapist for about four months because his last one made unprofessional comments at his last appointment.

About two months later, in P.R.'s case, the juvenile court returned P.R. to his mother, O.E., subject to various conditions. These included that O.E. live in the home of maternal great-grandmother. P.R. was detained again just a few months later, in March 2021, after the Department learned mother violated this condition.

Shortly thereafter, the Department filed an amended subsequent petition against father alleging he had unresolved mental health issues. The juvenile court sustained this petition in May 2021 and denied further reunification services. By that time, as the Department noted, father had received almost three years of combined family reunification, family maintenance, and/or enhancement services. The juvenile court ordered monitored visitation for father three times per week for three hours per visit and set a section 366.26 permanency planning hearing for September 2021.

In P.R.'s half brothers' case, the juvenile court conducted a contested 12-month review hearing which concluded in June 2021 with findings that father had a long history of untreated psychological issues that placed the boys at substantial risk of harm. The court noted father was not undergoing the amount of counseling recommended, that his mental health had recently regressed, and that he was inconsistent in taking medication. It gave a litany of examples of how father's "impaired perception of the real world" put his children at risk. The court noted father did not understand the children's grade levels. He thought they did not need medication or therapy because he could serve as their therapy. He felt school was unnecessary because he could be their teacher and that, at the very least, they should be removed from school if other children interfered with them.

The court also noted instances where the risk father posed to his children had actually manifested. For example, acting on his advice, the boys stole $1,000 from their caregiver. Also, acting on father's advice, one of the boys feigned a suicidal act. The court found the boys were happy in their current placement but stated a mild preference to live with their father. However, the boys also at times did not even want to speak to father when he called. The juvenile court terminated reunification services for these boys as well and set a section 366.26 permanency planning hearing for October 2021.

The Department's September 2021 report filed in advance of P.R.'s scheduled section 366.26 hearing reflected that P.R. was doing well in the care of maternal great-grandmother. Though father was entitled to in-person visits, the report reflected that father visited P.R. by phone only. The scheduled section 366.26 hearing was rescheduled to November 2021 due to a stay granted by this court.

The section 366.26 hearing scheduled for the 11- and 13-year-old boys in October 2021 was similarly continued for notice to the parents and further assessment of their permanent plan.

The Department's report in advance of P.R.'s rescheduled section 366.26 hearing reflected that father was continuing to visit with P.R. by remote means only notwithstanding his right to have in-person visits. P.R. expressed a preference to live with maternal great-grandmother, where he was continuing to do well and had lived for "most of [his] li[fe]." The juvenile court ordered legal guardianship by maternal great-grandmother as P.R.'s permanent plan.

10

On December 28, 2021, father filed a section 388 petition as to P.R. requesting a change of the juvenile court's May 2021 order terminating reunification services and setting the section 366.26 hearing. The changed circumstances father identified were that he had "addressed all the issues that . . . brought th[e] matter before the [c]ourt" by "previously participat[ing] in monthly counseling services [in 2019 and 2020]," "attending mental health services with the Department of Mental Health . . . since December 02, 2020," and "consistently maintain[ing] phone and in-person visits with [P.R.]." Father contended returning P.R. to him would be in P.R.'s best interest because father is capable of "provid[ing] him with care, love, and familial support."

The court scheduled a hearing on whether to grant an evidentiary hearing.

The Department's December 2021 status review report in the 11- and 13-year-old boys' case reflected that father had not had recent contact with the boys despite being entitled to three in-person visits per week. Father had not provided a monitor for visits. Both boys said they liked living with their current caregiver, where they had been placed for two years. They were doing well and receiving school and mental health services that father had previously refused to approve.

On December 28, 2021, father filed section 388 petitions as to the 11- and 13-year-old boys requesting a change of the juvenile court's June 2021 order terminating reunification services and setting the section 366.26 hearing. These petitions were substantially similar to father's petition relating to P.R. Father contended returning the boys to him would be in their best interest because of their "undeniable bond" with father, that father "has always been a caring and loving father, that has put

11

[the boys'] well-being in the forefront," and the boys love father and have expressed a desire to live with him.

On January 26, 2022, the juvenile court conducted a combined hearing on whether to conduct an evidentiary hearing on father's three section 388 petitions. It concluded that father had failed to make a prima facie case of changed circumstances or that modification of the prior orders would be in the children's best interests.

Father timely appealed on February 3, 2022.

A few months later, in April 2022, the juvenile court conducted a section 366.26 hearing for P.R. and appointed maternal great-grandmother as P.R.'s legal guardian. At the hearing, father objected to the plan of legal guardianship. In the alternative, he requested that the guardianship paperwork include visitation for father. In support, father noted concern that maternal great-grandmother had denied him, and would continue to deny him, visitation. The order signed by the court provided "Mother and Father to have monitored visits" without stating any frequency or duration.

Father appealed on April 18, 2022.

In July 2022, the juvenile court conducted a section 366.26 hearing for the 11- and 13-year-old boys and appointed their caregiver as their legal guardian. As he did at P.R.'s section 366.26 hearing, father objected to the plan of legal guardianship and alternatively requested that the guardianship paperwork specify his visitation rights to address his concerns about caregiver willingness to permit visitation. The order signed by the court provided "Monitored visitation with Father monitored by a paid professional paid by Father[] or mutually agreed upon monitor."

Father appealed on August 10, 2022.

## DISCUSSION

### 1.   Mootness

As a preliminary matter, we note that, as of this writing, the juvenile court has terminated jurisdiction over all children involved in these appeals.  The circumstances under which termination of juvenile court jurisdiction renders a pending dependency appeal moot are the subject of some disagreement. (See *In re S.G.* (2021) 71 Cal.App.5th 654, 664-665.)  Neither party to the appeal has argued that these appeals are moot.  We exercise our discretion to consider their merits.  (*In re D.P.* (2023) 14 Cal.5th 266, 282 ["Even when a case is moot, courts may exercise their 'inherent discretion' to reach the merits of the dispute"].)

### 2.   The Trial Court Did Not Abuse Its Discretion in Denying the Section 388 Petitions Without a Hearing

Section 388, subdivision (a)(1), authorizes the parent of a dependent child to, "upon grounds of change of circumstance or new evidence," petition the juvenile court "for a hearing to change, modify, or set aside any order of court previously made." (*Ibid*.)  "The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing.  [Citation.]'  [Citations.]  There are two parts to the prima facie showing:  The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)  "To support a section 388 petition, the change in circumstances must be substantial."  (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) "[A] primary consideration in determining the child's best

13

interest is the goal of assuring stability and continuity." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

"A juvenile court may summarily deny a section 388 petition without an evidentiary hearing, but 'a petition must be liberally construed in favor of its sufficiency [citation] and a hearing may be denied only if the application fails to reveal any change of circumstance or new evidence which might require a change of order.' " (*In re R.A.* (2021) 61 Cal.App.5th 826, 836; see also § 388, subd. (d); Cal. Rules of Court, rule 5.570(a) ["A petition for modification must be liberally construed in favor of its sufficiency"].)

Conclusory allegations in a petition or its supporting declarations are insufficient to make the required prima face showing. "If a petitioner could get by with general, conclusory allegations, there would be no need for an initial determination by the juvenile court about whether an evidentiary hearing was warranted. In such circumstances, the decision to grant a hearing on a section 388 petition would be nothing more than a pointless formality." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.)

"In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

We review the juvenile court's decision not to hold a hearing for an abuse of discretion. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1158.)

Father's section 388 petitions fail to make a prima facie case of changed circumstances or new evidence. The information contained in the petitions was either before the juvenile court

14

when it entered the orders father sought to modify or is too conclusory to be meaningful.

For example, father states that "[s]ince the court terminated my Family Reunification Services, I have completed Parenting Classes, Domestic Violence Classes, random and on demand testing, Individual Counseling, and Mental Health services." He then refers to (i) mental health services he received in 2019 and 2020, until stopped due to the COVID-19 pandemic; and (ii) those he started at the end of 2020 with the Department of Mental Health, and continued through the time he filed the petitions. He does not describe any other programs. Father avers that by completing his programs he has "learned the importance of humility, wisdom, and self-discipline."

Father ignores that all services referenced in his section 388 petitions were known to the juvenile court prior to entry of the orders father sought to modify. These proceedings began in 2018. Father completed domestic violence counseling, parenting classes, and individual counseling to address case issues not later than January 2019, a fact disclosed to the court not later than May 2019 and repeatedly thereafter. He also completed a drug program, and perhaps additional parenting and domestic violence classes, not later than October 2020. Father's participation in mental health services in 2019 and 2020 was known to the court not later than May 2020. And father's ongoing mental health services with the Department of Mental Health were known to the court not later than May 2021.

The only services disclosed in his section 388 petitions that father received after the date of the orders he sought to modify were more sessions with the Department of Mental Health that had begun months before the orders. These were once-monthly

15

sessions. That father may have attended about five more sessions of mental health therapy that had been ongoing at the time of the subject orders is not a substantial change in circumstances. Moreover, father's petitions do not address two major concerns the court had at the time of the orders—that father had refused to undergo weekly, as opposed to monthly, therapy sessions and take psychotropic medications as Dr. Morris recommended. Father's petitions make no mention of taking any medications.

Other facts father refers to in his section 388 petitions were similarly before the juvenile court when it entered the orders he sought to modify. For example, then, and as of the petitions, father was having regular phone visits with the 11- and 13-year-old boys. As to P.R., it is unclear from the record how much father was visiting him at the time of the order. But it is equally unclear from father's petition when he began to "maintain[] consistent quality visits with [P.R.] whether in-person or via phone." This ambiguous claim is devoid of any meaningful detail, including whether those visits father "maintained" were taking place in May 2021, when the juvenile court entered the order father petitioned to change, and how frequently the visits were occurring.

Father also notes in the petitions that he has "stable housing and income." Father's housing situation had been stabilized at least as far back as November 2020 when he tried to coax the 11- and 13-year-old boys home from their foster placement with promises that they could stop going to school and play Xbox all day at father's new "nice big four bedroom house." His housing was therefore not a changed circumstance.

In short, nothing on the face of father's section 388 petitions states a new fact or circumstance that, if proven, would necessarily sustain a favorable decision on the petitions. (See *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806 ["[t]he prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition"].) The juvenile court did not abuse its discretion in declining to hold an evidentiary hearing on the petitions.

3. **The Trial Court Abused Its Discretion in Ordering Visitation Without Specifying Frequency or Duration**

When a juvenile court orders legal guardianship as a dependent's permanent plan, it must "also make an order for visitation with the parents . . . unless the court finds by a preponderance of the evidence that the visitation would be detrimental to the physical or emotional well-being of the child." (§ 366.26, subd. (c)(4)(C).) When the court makes a visitation order, it cannot delegate authority to a third party to decide whether visitation will occur. (*In re M.R.* (2005) 132 Cal.App.4th 269, 274.) The only authority the court can delegate is the time, place, and manner in which visits will occur. (*Ibid.*)

We review visitation orders in connection with the appointment of a legal guardian for abuse of discretion. (*In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1314.)

Here, the juvenile court failed to express father's visitation rights in terms of frequency and duration, effectively leaving it to the appointed legal guardians to decide whether visits will occur at all. This amounts to an abuse of discretion. (See, e.g., *In re Rebecca S.*, *supra*, 181 Cal.App.4th at p. 1314 [visitation order was abuse of discretion because "leaving the frequency and

17

duration of visits within the legal guardian's discretion allows the guardian to decide whether visitation actually will occur"].) The Department concedes error in the visitation terms of all three children's guardianship orders for this reason.

Father asserts that "[t]he matter should be reversed and remanded for a new section 366.26 hearing, or at a minimum to specify the frequency and duration of father's visits." We find no reason to remand for a new section 366.26 hearing.

## DISPOSITION

The juvenile court's denials of father's three section 388 petitions are affirmed.

The juvenile court's guardianship orders dated April 15, 2022 and July 28, 2022 are reversed only as to the terms of father's visitation rights. These matters are remanded to the juvenile court for the limited purpose of fashioning appropriate visitation orders that include, at a minimum, the frequency and duration of visits to which father is entitled. In all other respects, the guardianship orders are affirmed.



GRIMES, Acting P. J.

WE CONCUR:


WILEY, J.          VIRAMONTES, J.

18